**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ELVIN LeBRON,

                                        Plaintiff,

          v.                                                      No. 05-CV-172
                                                                  (GTS/DRH)

DONALD SELSKY; GLENN S. GOORD; ANTHONY
J. ANNUCCI; LUCIEN J. LeCLAIRE, JR.; JOHN H.
NUTTALL; JOHN J. DONELLI; THOMAS RICKS;
B. GRANISH; S. STUART; BRUCE J. SMITH; JOHN J.
LeCLAIRE; R. WELLS; C.O.; SGT. SORENZON;
GREGORY L. BOYTON; A.C. ROCQUE; Lt.;
J. COLBY, Lt.; CAPT. FAULKNER; DAVID L. McNULTY;
B. JARVIS; WILLIAM BURKE; KEVIN L. McLAUGHLIN;
THOMAS C. SANDERS; PEGGY WALCOTT;
RICHARD D. ROY; JOHN MEHRMANN; C.C.
PASQUIL; M. LeFERVE; CAPTAIN RACETTE;
JOSEPH E. McCOY; ROBERT J. MURPHY; MR.
JEFFREY HALE; McKERNON, C.O.; J. LITWEILER,
Sgt.; LT. MARSHALL; PAUL CHAPPINS, JR.;
MICHAEL McGINNIS, Supt.; D. HILLARD; D.
SULLIVAN, Capt.; LT. DONAHUE; SGT. WETZEL;
and M. SHEAHAN, Captain,

                                        Defendants.

_____

**APPEARANCES:**                          **OF COUNSEL:**

ELVIN LeBRON
No. 95-A-0121
Plaintiff Pro Se
Auburn Correctional Facility
Post Office Box 618
Auburn, New York 13021

HON. ANDREW M. CUOMO                       JAMES J. SEAMAN, ESQ.
Attorney General for the                   Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Elvin LeBron ("LeBron"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, ninety-five DOCS employees, violated his constitutional rights under the First and Fourteenth Amendments.  Am. Compl. (Docket No. 6).  Presently pending is the motion of the remaining forty-two defendants for summary judgment pursuant to Fed. R. Civ. P. 56.  Docket No. 179.  LeBron opposes the motion.  Docket No. 185.  Additionally, LeBron has moved to supplement his amended complaint and to strike defendants' submissions.  Docket Nos. 186, 187.  Defendants oppose the motion to strike. Docket No. 191.  For the following reasons, it is (1) recommended that defendants' motion be granted in part and denied in part, (2) recommended  that the amended complaint be dismissed without prejudice as to the unserved defendants, and (3) ordered that LeBron's motions be denied.


### I. Procedural Status

By a Memorandum-Decision and Order dated November 2, 2007, Lebron's First, Second, Third, Fifth, and Sixth causes of action were dismissed.  Docket No. 132. Additionally, in the Fourth cause of action, the only claims remaining are for violations of LeBron's due process rights for (1) the refusal to answer and rectify Lebron's multiple

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

complaints as to defendants Selsky, Goord, Annucci, L. Leclaire, Donelli, Ricks, Sanders, Roy, Pasquil, Leferve, Racette, McCoy, and Murphy (Docket No. 132 at 11-12, 13-14), and (2) the failure of defendants Faulkner, McLaughlin, and Mehrmann to ensure proper procedural due process during LeBron's disciplinary hearing (Docket No. 132 at 11, 13-14). Furthermore, the Fourth claim survives to the extent that LeBron alleges that he was issued a retaliatory misbehavior report and fell victim to the planting of false evidence in his cell due to LeBron's previous filing of a grievance against prior defendant Woodroof.  Docket No. 132 at 15-17.  Lastly, in the Seventh cause of action, the only remaining claim is his First Amendment interference with mail claim.  Docket No. 132 at 18-20.

## II. Background

The facts are related herein in the light most favorable to LeBron as the non-moving party.  See Section II(A) infra.  Further, at all relevant times, LeBron was an inmate in the custody of DOCS.

### A. Retaliatory Misbehavior Report and Planting of Evidence

While incarcerated at the Adirondack Correctional Facility on November 29, 2001, Lebron was advised by former defendant Woodroof that the white hooded sweatshirt LeBron was wearing was against facility regulations.  LeBron Dep. (hereinafter "Dep.") (Docket No. 179-3) at 42-44.  Woodroof stated that LeBron could either receive a misbehavior report for the violation or send the sweatshirt home.  Id. at 44.  LeBron chose

to mail the sweatshirt home.  Id. at 44.  On December 12, 2001, LeBron filed a grievance[2]

against Woodroof alleging harassment regarding the sweatshirt.  Docket No. 179-4 at 1.

LeBron subsequently mailed the hooded sweatshirt home, incurring approximately $6 in

shipping fees.  Id. at 7.  LeBron then submitted to the facility a claim for reimbursement

which was denied by defendant Jarvis on December 18, 2001.  Id. at 8.  Defendant

Sorenzen condoned the actions of Woodroof in threatening to give LeBron a misbehavior

report if he failed to send the sweatshirt home.  Id. at 1; Dep. at 44-46.  LeBron's grievance

was denied by the IGRC on December 27, 2001 (Id. at 16), denied by defendant Sanders,

the Superintendent, on January 4, 2002 (Id. at 17), and denied by CORC on January 30,

2002 (Id. at 22).[3]

    After the grievance was filed, corrections staff began to search LeBron's living quarters

on a regular basis.  Dep. at 46.  On December 28, 2001, LeBron filed another grievance

regarding the frequent searches following his earlier grievance against Woodroof.  Docket

No. 185-5 at 9; see also Docket No. 179-5 at 1 (asserting that the first four searches

occurred on November 30 and December 3, 11, and 28, 2001; Dep. at 49-50, 61-62.

LeBron advanced concerns that correctional staff would continue to search his cell and

eventually plant evidence or issue a false misbehavior report in retaliation for his filing the

---

[2]"The IGP [Inmate Grievance Program] is a three-step process that requires an
inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2)
appeal to the superintendent within four working days of receiving the IGRC's written
response, and (3) appeal to the CORC [Central Office Review Committee] ... within four
working days of receipt of the superintendent's written response." Abney v. McGinnis, 380
F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[3]Defendants Burke and McLaughlin then initiated a new policy which provided that
when an inmate was dressed in inappropriate attire, the inmate was to be issued a
misbehavior report and the clothing was to be confiscated.  Docket No. 179-4 at 24.

December 12, 2001 grievance.  Docket No. 185-5 at 9.  A notation on the grievance on January 15, 2002 indicated that the investigation revealed "no wrong doing on the part of security staff."  Id.

On January 10, 2002, McLaughlin received a telephone call from defendant Walcott, a DOCS official in Albany, advising McLaughlin that LeBron possessed contraband because the letter LeBron had sent to Albany contained white-out correction fluid, which was banned from inmates.  Disciplinary Hearing (hereinafter "Hearing") (Docket No. 179-7) at 23; Dep. at 66-68.  LeBron never remembered writing to Walcott and could not remember whether he ever used white-out on a letter that may have been forwarded to her in Albany.  Dep. at 66-67.  LeBron contends that white-out is not contraband.  Id. at 67.[4]

Based on the information that LeBron possessed contraband, McLaughlin ordered LeBron's cell searched.[5]  Hearing at 24.  On January 10, 2002, defendants Smith and J. LeClaire were ordered to search LeBron's cell.  Docket Nos. 179-5 at 14-18, 185-5 at 10.  Three bottles of white-out and a razor blade sheath, which constituted contraband items and a weapon, were discovered in LeBron's inmate locker.  Docket Nos. 179-5 at 14-18, 185-5 at 10, 179-6 at 17-20.  Defendant Rocque reported the incident, defendant Boyton was notified, LeBron was handcuffed, and Boyton, LeClaire, and Smith escorted LeBron to

---

[4] The letter containing the white-out was never produced to LeBron during the disciplinary hearing.  Hearing at 27.  Additionally, it does not appear that the letter was provided during discovery in this action.

[5] During his deposition, LeBron claimed that Faulkner ordered the cell searches.  Dep. at 50.  However, the hearing transcript and Faulkner's declaration indicate otherwise.  Hearing at 24; Faulkner Decl. (Docket No. 179-13) ¶¶ 3-7 (indicating that random searches were performed according to a computer program and the January 10, 2002 cell search was directed by a different office other than Faulkner's).

the Special Housing Unit ("SHU")[6] for confinement pending the disciplinary hearing.  Docket Nos. 179-5 at 14-18, 185-5 at 10, 179-6 at 15.  The misbehavior report was reviewed by defendant Colby.  Docket Nos. 179-5 at 13, 179-6 at 2.

## B. Disciplinary Hearing[7]

On January 12, 2002, LeBron received an inmate misbehavior report regarding the contraband found in his cell locker.  Docket No. 179-6 at 6; Dep. at 81.  Mehrmann was appointed to assist LeBron and met with him on January 14, 2002 at approximately 8 a.m. Docket No. 179-6 at 7.  LeBron requested that inmate Jeffrey Washington and J. LeClaire testify at the hearing and that various other documents and photographs be provided. Docket Nos. 179-5 at 15, 179-6 at 7-8.

The hearing began on January 16, 2002 and continued until January 23, 2002.  Hearing at 1.[8]  At the hearing, LeBron indicated that he was dissatisfied with Mehrmann's assistance because Mehrmann failed to provided him with (1) unredacted log book pages from the

---

[6] SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

[7] Both parties refer to the testimony given during the hearing by LeClaire.  However, no testimony is contained in the hearing transcript.  The parties do not appear to contend that the hearing tapes have been destroyed in expunging the disposition from LeBron's record, but contrary to LeBron's claims, the transcript remains.  Dep. at 89-92 (stating that hearing tapes were erased prior to expungement).

[8] LeBron contended that the hearing began prematurely as twenty-four hours had not passed between meeting with his inmate assistant and the hearing's commencement. Dep. at 84.

6

date of the incident, and (2) log entries from dates of prior cell searches of November 30,

December 3, 11, and 25 and January 10, the gym and the SHU.  Hearing at 2-7; Dep. at

82-83 (stating that he could not specifically recall what Mehrmann failed to provide him).

Faulkner denied the requests as they were irrelevant to the misbehavior report because

they occurred on dates and in places other than where the contraband was discovered.

Hearing at 2-7.  LeBron also requested and was denied inventory sheets pertaining to the

number of razors and bottles of white-out within the facility.  Id. at 10.  The requests were

denied because such inventories were not maintained by the facility.  Id. at 10.  LeBron also

requested and was denied the opportunity to to dust the contraband and his cell for

fingerprints.  Id. at 10.

LeBron continued to argue that white-out was not contraband, a contention rejected by

Faulkner, because it was not allowed in the facility, it could not be sent to inmates in

packages, and it could not be purchased by inmates in the commissary.  Hearing at 11-12;

see also Dep. at 73 (concurring with Faulkner's statements about white-out's unavailability).

LeBron also requested that a second officer be called to testify in place of an individual that

he mistakenly named.  Hearing at 12.  The request was honored and the corrections officer

testified on January 17.  Id. at 22-23.

As to inmate Washington's testimony, LeBron was informed that Washington had

advised defendant Wells on January 15, 2002 that he declined to testify because he did not

wish to be involved.  Hearing at 13.  LeBron requested that Faulkner interview Washington

in the belief that Washington witnessed the search.  Id. at 14.  Faulkner agreed and

interviewed Washington on January 17, 2002.  Faulkner reported that Washington stated

that he did not see the cell search.[9]  Id. at 27; Docket Nos. 179-5 at 17, 179-6 at 12.  When

Faulkner asked if LeBron had any additional witnesses, LeBron identified an inmate, Steven

McFarlin, who had also allegedly witnessed the search but had since been paroled and was

living in New York City.  Id. at 14-15, 40-41.

After addressing the preliminary requests and complaints, Faulkner read the

misbehavior report into the record and LeBron entered a plea of not guilty.  Hearing at 15-

16.  While discussing the facts of the case, LeBron asserted that the contraband items were

planted in his cell in retaliation for the grievance against Woodroof.  Id. at 19-20; Dep. at 57-

58, 68-69.  LeBron further asserted that (1) he had never lodged grievances against

LeClaire or Smith, the defendants who found the contraband; (2) Woodroff was not a party

to that misbehavior report; and (3) all previous "retaliatory" searches were conducted by

different officers, all of whom were not involved in the final search with LeClaire and Smith.

Id. at 20-22.

The following day, the replacement witness for LeBron testified.  Hearing at 22-23.  The

witness was questioned by both Faulkner and LeBron.  Id.  On January 18, McLaughlin

testified regarding the telephone call he received from an individual in Albany advising that

she had received a letter from LeBron containing white-out.  Id. at 23-24; see also Dep. at

64-67 (explaining that LeBron was told by both McLaughlin and Granish that they each

received the telephone call from Walcott in Albany), 85-86.  The cell search was then

ordered.  Id. at 24, 27.  LeBron was given the opportunity to question McLaughlin.  Id. at 24.

_____

[9] During his deposition, LeBron claimed that when he spoke to Washington,
Washington admitted that he witnessed the search on January 10 and "kn[e]w they didn't
find anything because they didn't pull anything out of [LeBron's locker]."  Dep. at 54-55.

He asked one question and was presented with "a readable copy of the tape on the evidence . . . ." Id.[10]  Following the hearing, LeBron wrote to Faulkner and McLaughlin, posing at least eighteen questions to McLaughlin that he was unable to ask during the hearing because LeBron was unaware that he would be testifying.  Id. at 28-29; Docket No. 179-6 at 22-26.  McLaughlin answered the questions over the weekend, and Faulkner read the answers into the record during the hearing when it resumed the following week. Hearingat 29-30; Docket No. 179-6 at 27-28.

On January 17, after McLaughlin's testimony, Faulkner again reviewed the relevance of each document LeBron had requested from his inmate assistant.  Hearing at 25-26. Faulkner also listed the documents LeBron received from his inmate assistant, including copies of three memoranda.  Id. at 26; see also Docket No. 179-6 at 30-32 (copies of memoranda).  LeBron objected to the documents, claiming that they had not been provided to him. Hearing at 26.  Faulkner provided LeBron with additional copies of the memoranda on January 22 during the hearing.  Id. at 28.  When the second set of copies was given to LeBron, he conceded that he had already received the memoranda.  Id.[11]

After Faulkner reviewed the various memoranda and the answers McLaughlin had submitted to LeBron's written questions, defendant Smith testified that he had been instructed to search for bottles of white-out and that they recovered multiple bottles and a

---

[10] During his deposition, LeBron indicated that Faulkner prohibited McLaughlin from answering LeBron's questions.  Dep. at 86-88.

[11] The hearing transcript appears to have a slight abridgment between 11 a.m. and 2:15 p.m.  Hearing at 27.  Between two long sections of transcript is a short paragraph of Faulkner discussing his interview with Washington and the reasons for the cell search. Id.  It does not appear that testimony continued but that a break was taken and the tape needed to be reversed.  It does not appear that a material portion of transcript is omitted.

razor blade hidden in a medicine packet.  Hearing at 32.  Lebron was then given the

opportunity to question Smith.  Id. at 33.  During the questioning, LeBron was chastised

multiple times by Faulkner for asking questions already answered or which were irrelevant.

Id. at 32-36.  LeBron was warned not to ask harassing questions to Smith and after posing

four additional harassing questions, LeBron's questioning was terminated.  Id. at 36-38.

LeBron was still permitted to read additional objections into the record.  Id. at 39-42.

Objections included the failure to provide the whited-out letter that Walcott received and the

inability to find former inmate McFarland and elicit his testimony.  Id.  At the conclusion of

that day's proceedings, Faulkner indicated that he would attempt to find McFarland through

parole and department records.  Id. at 41.

On the final day of the hearing, Faulkner received testimony from a non-party

corrections officer, Carl Provost, who stated that LeBron refused to leave his cell to hear the

disposition of the hearing.  Hearing at 43.  Provost advised that LeBron clearly understood

the consequences of refusing to participate in the final day of his hearing.  Id.[12]  Faulkner

indicated that he attempted to contact McFarland through the parole department, and no

forwarding telephone number was provided and there was no way to contact McFarland.  Id.

at 43.  In LeBron's absence, Faulkner indicated that he found LeBron guilty of two of the

three charges, he sentenced LeBron to 180 days of confinement and six months loss of

good time, and a copy of the disposition would then be delivered to LeBron by Provost.  Id.

at 44; Docket Nos. 179-5 at 12, 179-6 at 4.  Later that day, LeBron appealed the disposition

claiming that he was denied his rights to attend the hearing when he informed the escort

---

[12]LeBron denies ever refusing to attend the final day of the hearing.  Dep. at 101-102.

officer that he was unable to walk and the escort officer did not obtain accommodations to assist him to the hearing.[13]  Docket No. 179-8.

On January 25, 2002, LeBron received a memorandum from Sanders affirming the disciplinary disposition because Sanders "f[ound] no compelling reason to change, modify or alter the decision rendered to you."  Docket No.185-5 at 26.  Identical responses were received from defendants Selsky on April 26, 2002 and Murphy on July 25, 2002.  Docket Nos. 185-5 at 45, 179-9 at 45.  On October 23, 2002, Selsky wrote to defendant McGinis, then the Superintendent, advising that the disposition of the hearing had been reversed and expunged.  Docket No. 185-5 at 78.


### C. Interference with Mail

On July 26, 2003, defendants Chappins and McGinnis directed that LeBron be placed on mail watch for sixty days and that all his outgoing mail be forwarded to Chappins. Docket No. 179-10 at 2.  The mail watch was extended on October 27 and December 29, 2003, and it was noted that LeBron received 180 days of disciplinary segregation for violating facility correspondence rules.  Docket No. 179-10 at 3-4.  Another extension was issued on February 27, 2004.  Docket No. 179-10 at 4.

 LeBron was issued a misbehavior report on February 27, 2004 for correspondence violations.  Docket No. 179-12 at 1.  LeBron claimed that two pieces of his mail intercepted on February 23 and 25, were illegally opened and examined without sufficient cause.  Dep.

_____

[13] Medical records indicate that from November 2001 until February 2002, the time period prior, during, and subsequent to the hearing, LeBron made no complaints of, pain, or trouble walking.  Docket No. 190-2

at 7, 13; Docket No. 179-12 at 1.  LeBron filed multiple grievances pertaining to the

allegedly false accusations and improper interference with his mail.  Docket Nos. 179-12 at

1-9, 185-5 at 96-168.  During his disciplinary hearing regarding the misbehavior report held

on March 2, 2004, LeBron pleaded guilty to the charges in the misbehavior report.  Docket

No. 190-3 at 2-4.[14]

## II. Discussion

As discussed previously, all that remains are LeBron's claims that (1) the January 10,

2002 search and misbehavior report were filed in retaliation for the grievance LeBron filed

against Woodroof, (2) multiple supervisory defendants failed to intervene to remedy the

wrongs that followed from the cell search, (3) he was denied procedural due process during

his January 23, 2002 disciplinary hearing, and (4) certain defendants interfered with his

legal mail.  Defendants seek judgment on all claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact if supported by affidavits or other suitable evidence and the moving party is

entitled to judgment as a matter of law. The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

---

[14] During his deposition, LeBron identified and read the confiscated letters, one of which instructed the recipient to send a second enclosed letter to an inmate at Attica Correctional Facility.  Dep. at 41-42.  Inmate-to-inmate correspondence is prohibited by DOCS without DOCS approval.  See Turner v. Safley, 482 U.S. 78, 91 (1987) (upholding a regulation prohibiting this limitation on inmate correspondence); Purnell v. Lord, 952 F.2d 679, 685 (2d Cir. 1992).

depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

**B. Exhaustion**

As a threshold matter, defendants contend that LeBron has failed to exhaust his

administrative remedies.  Under 42 U.S.C. § 1997e(a), an inmate must exhaust all

administrative remedies prior to bringing any suits challenging prison conditions, including

federal civil rights cases.  Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v.

Ngo, 126 S. Ct. 2378, 2382-83 (2006).  This exhaustion requirement applies to all prison

condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or

duration of a prisoner's overall confinement is necessarily a condition of that confinement."

Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also

applies even if the administrative grievance process does not provide for all the relief

requested by the inmate.  Nussle, 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has

recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175

(2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)).  Exhaustion is

generally achieved through the IGP.  See N.Y.Comp. Codes R. & Regs. tit. 7, § 701.1 et

seq. (2001); see also note 8 supra.  However, "[t]he New York IGP regulations do not state

that a prisoner's grievance must name the responsible party."  Espinal v. Goord, 558 F.3d

119, 126 (2d Cir. 2009).  Therefore, "[b]ecause . . . the IGP does not articulate an

identification requirement, it is plain that a New York state prisoner is not required to name

responsible parties in a grievance in order to exhaust administrative remedies."  Id.

Here, defendants contend that not all defendants in this case were included in LeBron's

various grievances.  However, there is no dispute that LeBron sufficiently filed grievances

which pertained to the alleged retaliation (Docket Nos. 179-5 at 1, 185-5 at 9; Dep. at 49-

14

50, 61-62); the false misbehavior report from January 10, 2002, subsequent disciplinary hearing, and disposition rendered January 23, 2002 (Docket Nos. 179-8, 179-9 at 7, 19, 21, 38-39, 43); and the investigation, search, and resulting misbehavior report regarding his outgoing mail in Southport (Docket Nos. 179-12, 185-5 at 96, 102, 104, 107, 109, 114, 116, 125, 133, 136-38, 142, 148, 154, 167-68).  As such, the content of these grievances placed all potentially related defendants on notice of their involvement in the grievances and any potential, subsequent litigation.  Naming each involved defendant was not required to exhaust LeBron's administrative remedies.

To the extent that defendants contend that exhaustion did not occur through the filing and subsequent appeal of LeBron's grievances, such contentions are also without merit. The record indicates that LeBron filed and appealed the majority of his grievances and sought special reconsideration by the superintendents under their powers of discretionary review.  Docket No. 185-5 at 26, 45.  Such actions demonstrate that LeBron exhausted all methods of obtaining administrative relief available to him.

Accordingly, defendants' motions on this ground should be denied.


### C. Personal Involvement

Defendants contend that LeBron has failed to establish the personal involvement of any of the "correspondence defendants."[15]  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright

---

[15] "Correspondence defendants" were those apprised of the alleged constitutional violations through LeBron's correspondence with individuals both within and outside the grievance process.

v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d

880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because

they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).

However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged
> constitutional violation;
>
>  (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance
> of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).

### 1. Burke, Murphy, and Selsky

Burke signed a grievance denial on February 11, 2002, stating that the hearing on

January 23, 2002 addressed all the issues raised by LeBron.  Docket No. 179-5 at 3, 7.

Both Murphy and Selsky, in their capacities as Superintendent, denied LeBron's requests

for reconsideration of his January 23, 2002 disciplinary hearing because there were not

"sufficient grounds to reconsider the previous decision on that hearing [and that f]urther

administrative action w[ould] not be forthcoming."  Docket Nos. 179-9 at 45, 185-5 at 45.

16

On October 23, 2002, Selsky determined that the same hearing would be reversed and expunged.  Docket No. 185-5 at 78.

From this correspondence and construing the facts in the light most favorable to LeBron, it appears that Burke, Murphy, and Selsky all reviewed the hearing, evaluated the evidence and findings, and responded to LeBron.  This demonstrated personal knowledge of the potentially unconstitutional segregation which was occurring and continuing.  Such investigation and response suffices to establish personal involvement.  See Atkins v. County of Orange, 251 F. Supp. 2d 1225, 1234 (S.D.N.Y. 2003) ("Personal involvement will be found, however, if an official acts on a prisoner's grievances or otherwise responds to them.") (citations omitted).

Accordingly, defendants' motion should be denied on this ground.


## 2. L. LeClaire

LeClaire was often delegated the responsibility to investigate and respond to LeBron's various complaints.  Docket No. 179-9 at 6, 11, 23, 27, and 35.  LeClaire was also directly contacted by LeBron regarding various complaints, including his issues at Adirondack.  Id. at 21.  LeClaire responded to complaints about the retaliation which allegedly resulted in the false misbehavior report and January 23 hearing.  Id. at 5, 29, 31, 34, and 52.

Viewing the facts in the light most favorable to LeBron, L. LeClaire was uniquely involved in the investigation and potential perpetuation of LeBron's administrative segregation.  L. LeClaire was charged with the investigation of many of LeBron's complaints and memorialized his findings in correspondence to LeBron.  This suffices to establish

17

personal involvement.  See Atkins, 251 F. Supp. 2d at 1234.

Accordingly, defendants' motion on this ground should be denied.


### 3. Granish, Hale, and Sheahan

Granish responded to at least five requests from LeBron for information between March

and July, 2002 and another in October 2002.  Docket No. 185-5 at 33, 39, 62-63, 66, 73,

79.  Hale was presumably involved with the grievance procedure at Southport Correctional

Facility as all correspondence between he and LeBron occurred in 2004 while LeBron was

incarcerated there.  The correspondence concerned multiple grievances about actions

occurring during LeBron's incarceration at Southport and the ability to consolidate such

grievances.  Id. at 91, 100-101, 106, 108, 115, 119, 120-21, 128-29, 139, 147.  Sheahan

was involved with the movement, classification, and placement of LeBron during his

incarceration.  Id. at 105, 127.  As such, these defendants were not directly involved in any

constitutional violation occurring while LeBron was incarcerated at Adirondack in January.

Moreover, LeBron has proffered no evidence that Granish, Hale or Sheahan created a

policy which allowed constitutional violations to continue or was grossly negligent in

managing subordinates.

Accordingly, defendants' motion as to Granish, Hale, and Sheahan on this ground

should be granted.


### 4. Goord

Goord delegated to subordinates the task of responding to LeBron's various

18

complaints.  The record reflects at least eighteen items of correspondence that were sent to LeBron from a third party, at the direction of Goord.  Docket Nos. 179-9 at 5, 10, 19, 34; 185-5 at 31, 52, 58, 71, 77, 90, 93, 155, 172, 179, 184, 187, 193, 195**.**  The record also shows correspondence from Goord to LeClaire instructing him to tend to LeBron's claims on at least five occasions.  Docket No. 179-9 at 6, 11, 23, 27, 35.  LeBron makes no assertions that Goord was personally involved in the actual events giving rise to his constitutional claims, merely that Goord was aware of the occurrences and allowed unlawful conduct to continue.

However, the fact that an official failed to investigate a letter alleging a constitutional violation fails to establish  personal involvement.  Westbrook v. CUNY, 591 F. Supp. 2d 207, 225 (E.D.N.Y. 2008).  Thus, Goord's failure to investigate the substance of these letters personally does not give rise to a claim of personal involvement.  "The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation."  Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (citing Ortiz-Rodriquez v. N.Y. State Dep't of Corr. Servs., 491 F  Supp. 2d 342, 347 (W.D.N.Y. 2007)).  As the record has shown, Goord referred multiple letters of complaint to the appropriate individuals for investigation and response.  This action is insufficient to sustain a claim of personal involvement.  Finally, LeBron has proffered no evidence that Goord created a policy which allowed constitutional violations to continue or was grossly negligent in managing others.

Accordingly, defendants' motion as to Goord should be granted.

19

### 5. Nuttal, Hillard, Roy, Annucci, McCoy, Ricks, and McNulty

There is no dispute that none of these seven defendants were directly involved in the events giving rise to the disciplinary hearing on January 23, 2002 or the mail watch. However, some were apprised of and involved in the alleged continuing constitutional violations which occurred.

Nuttal was contacted by LeBron and was advised that his present issues would best be discussed with, and determined through, the Inmate Grievance Office.  Docket No. 185-5 at 90.  Hillard was contacted about a control-and-movement order to which he responded that he had no authority over such matters and referred LeBron to Sheahan for further information.  Docket No. 185-5 at 105.  Annucci also wrote multiple letters to LeBron directing him to more appropriate departments to address his complaints.  Docket Nos. 179-9 at 41-42, 185-5 at 76.  Ricks referred most of the correspondence he received from LeBron to Donelli or Donaldson as they were the appropriate parties to address LeBron's concerns.  Docket No. 185-5 at 27, 34, 41-42, 46.  LeBron contacted McNulty to commence a criminal action against the defendants involved in the retaliatory misbehavior report and McNulty forwarded LeBron's complaints to the Inspector General's Office as that office was responsible for investigating such complaints.  Docket No. 179-9 at 21.  It is well-settled that referring letters to others for investigation and response is insufficient to demonstrate personal involvement.  Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997).  Thus, the fact that correspondence occurred between LeBron and defendants, or defendants and others, to refer complaints is insufficient to constitute personal involvement.   Additionally, LeBron has proffered no evidence that any of these defendants created a policy which allowed

constitutional violations to continue or was grossly negligent in managing other defendants.

Similarly, a letter was forwarded to Roy.  Docket No. 179-9 at 2.  Roy did not respond.

McCoy received copies of certain correspondence exchanged between the administration and LeBron.  Id. at 10, 19, 21.  Additionally, McCoy was accused of never responding to LeBron's complaints.  Id. at 21.  Sending letters and grievances alone will not suffice to sustain a claim for personal involvement.  See Sealey, 116 F.3d at 51 (finding that the failure of an individual to respond to a complaint is insufficient to allege personal involvement); Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) (reinforcing that a defendant "cannot be held liable on the sole basis that he did no act in response to letters of protest sent by [the inmate] . . . ."); Garrido v. Coughlin, 716 F. Supp. 98,  100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).   Finally, LeBron has proffered no evidence that McCoy or Roy created a policy which allowed constitutional violations to continue or was grossly negligent in managing other defendants.

Accordingly, defendants' motion as to Nuttal, Hillard, Roy, Annucci, McCoy, Ricks, and McNulty[16] should be granted.

---

[16] To the extent that LeBron claims that McNulty violated his constitutional rights by failing to institute criminal charges at his behest, such allegations fail to state a claim because there exists no constitutionally protected right to file criminal charges against anyone.  See Langworthy v. Dean, 37 F. Supp. 2d 417, 422 (D. Md. 1999) ("[A] right to compel the prosecution of criminal activity does not exist.").

**D. Retaliation**

LeBron contends that the basis for the January 10, 2002 cell search and subsequent misbehavior report were false in retaliation for LeBron's December 12, 2001 filing of a grievance against Woodroff.  Eight defendants were allegedly personally involved. Sorenzon received notice that LeBron was fearful that a search would result in planted contraband and a false disciplinary charge.  Docket No. 185-5 at 9.  Sorenzon investigated the complaint and assured LeBron that this would not occur while LeBron was simultaneously issued the disciplinary report.  Id.  Walcott called McLaughlin, who ordered the search which was executed by J. LeClaire and Smith.  Hearing at 23; Docket No. 179-5 at 14; 185-5 at 10.  Boyton was notified by Roque of the results of the search and LeBron was escorted to SHU.  Docket Nos. 179-5 at 14, 18, 185-5 at 10, 179-6 at 15.  Prior to the misbehavior report being served, it was reviewed by Colby.  Docket Nos. 179-5 at 13, 179-6 at 2.  After being sentenced to 180 days of confinement, LeBron sought assistance and additional review from Burke, Sanders, Murphy, Selsky, and L. LeClaire.  Docket Nos. 179-9 at 45, 185-5 at 26, 45.  On October 23, 2002, the disposition was reversed and expunged from LeBron's record.  Docket No. 185-5 at 78.

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone."  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (citing

Graham, 89 F.3d at 79).  Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. Id.  Conclusory allegations alone are insufficient.  Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).

Construing the facts in the light most favorable to LeBron, he has sufficiently alleged facts to support a retaliation claim.  First, LeBron indisputably was engaged in filing grievances, an activity protected by the First Amendment.  Almost immediately thereafter, LeBron voiced concerns about retaliatory disciplinary charges by defendants.  There followed the cell search and disciplinary charges and the document purportedly from LeBron containing the white-out has never been produced nor has Walcott's sworn statement.  On this record, then, a question of credibility is presented as to whether, as claimed by LeBron, he ever used white-out in a letter to Walcott or, as claimed by defendants, such a letter was received by Walcott.  If LeBron's assertion is credited, no basis existed for the cell search and he never possessed white-out, supporting his claim that the search and charges were done in retaliation for his grievances.

To the extent that defendants' claim LeBron's assertions are conclusory, such contentions are without merit.  LeBron must prove a negative – that he did not possess white-out or include white-out in a letter to Walcott.  By its nature, this requires a conclusory assertion of a denial.  Moreover, without any supporting testimony or physical evidence, defendants' claims appear conclusory.

Accordingly, defendants' motion as to this claim should be denied.

**E. Mail Tampering**

Still remaining are LeBron's First Amendment claims against defendants Chappins, McGinis, Wetzel, Marshall, Sullivan, and Donahue for the unconstitutional interception and examination of his mail.

**1. Mail Watch**

The interception of a prisoner's mail has been analyzed under both the First and Fourth Amendments.  United States v. Felipe, 148 F.3d 101, 108 (2d Cir. 1998).  "'[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison,'" but "it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system." Felipe, 148 F.3d at 107 (quoting Bell v. Wolfish, 441 U.S. 520, 545 (1979)).  The Supreme Court has held "that the interception of a defendant's prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail." Id. at 108 (citing United States v. Workman, 80 F.3d 688, 698-99 (2d Cir. 1996) (concluding "that - at least where prison officials have reasonable cause for suspicion - surveillance of inmate mail is unobjectionable under the [First and] Fourth Amendment[s].").

In this case, LeBron claims that defendants "tampered" with his mail through the mail watch.[17]  Before defendants found the letters in question but after the mail watch had

───────────────

[17]Mail watch "allow[s] a prison superintendent to authorize the inspection of outgoing and incoming mail if there is reason to believe that the correspondence threatens the safety of any person or the good order of the facility." Felipe, 148 F.3d at 105.

already been instituted for undisclosed reasons, LeBron was issued a misbehavior report, convicted, and sentenced to 180 days of segregated confinement for violating facility correspondence rules.  Docket No. 179-10 at 3-4.  Thus, regardless of what occurred prior to December 29, 2003, from that point on, defendants had reasonable cause to inspect Lebron's mail based on his proven misuse of the mail.  LeBron's second violation, at issue in this case, occurred on February 27, 2004.  During the subsequent disciplinary hearing, LeBron candidly admitted to violating the facility correspondence rules, further bolstering defendants' reasons for the mail watch.  Therefore, on this record, defendants did not violate LeBron's rights as their penological interests in maintaining compliance with facility rules outweighed LeBron's constitutional rights.

Thus, defendants' motion for summary judgment should be granted on this ground.

### 2. Denial of Outgoing Mail

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."  <u>Davis v. Goord</u>, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). While legal mail is afforded the greatest protection, "greater protection [is afforded] to outgoing mail than to incoming mail."  <u>Id.</u>  (citations omitted).  "Restrictions . . . are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved."  <u>Id.</u> (citations omitted).

As previously discussed, LeBron had a documented failure to adhere to facility correspondence rules which gave rise to concerns for institutional safety for those

incarcerated within the facility and those persons outside the facility with whom the inmate was communicating.  A mail watch is a recognized method of accomplishing such a balance between penological interests and an inmate's constitutional rights.  As previously discussed, defendants had a reasonable basis to institute the mail watch.  Moreover, the mail in question was not legal mail and, thus, was afforded less protection.  Additionally, the procedure was the least restrictive given the circumstances.

Therefore, defendants' motion on this ground should be granted.

## F. Fourteenth Amendment

LeBron contends that his right to due process was violated when he was given a false misbehavior report and denied certain rights during his disciplinary hearing by Mehrmann, Faulkner, McLaughlin, and Wells.

### 1. Due Process[18]

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v.

---

[18] Construing the multitude of letters attached to LeBron's response, it appears that Faulkner, Perham, Racette, and Donelli were allegedly involved in the denial of LeBron's credit for prehearing confinement relating to the current case.  However, Perham, Racette and Donelli were not personally involved in the events surrounding the hearing and, thus, claims against them cannot lie.  Moreover, while it is undisputed that LeBron possessed a liberty interest in remaining free from segregated confinement, no facts have been proffered regarding the impact of LeBron's prehearing confinement claims.  Additionally, no procedural due process violations were established.

26

McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998).  The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under Sandin.  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000).

As LeBron spent more than thirty days in keeplock, questions of fact exist as to the liberty interest asserted by LeBron.  Accordingly, defendants' motion on this ground should be denied.


### a. Fair and Impartial Hearing

While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  Prisoners are "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a

written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

### i. Notice

Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are . . . ." Wolff v. McDonnell, 418 U.S. 539, 564 (1974) (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct . . . charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges . . . ." Taylor v. Rodriguez, 238 F.3d 188, 192-93 (2d Cir. 2001) (citations omitted). Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges. Id. at 193.

In this case, LeBron contends that he received insufficient notice of the hearing because it occurred less than twenty-four hours after he met with Mehrmann. However, the record indicates that LeBron met with Mehrmann on January 14, two days prior to his hearing. Docket No. 179-6 at 7. More importantly, this does not define the applicable legal standard. LeBron was required to receive meaningful notice of the charges in the disciplinary report, which occurred when he was provided with the misbehavior report on January 12, four days before the commencement of the hearing. Id. at 6; Dep. at 81. There is no dispute that the misbehavior report served as adequate notice.

Accordingly, LeBron received all the notice he was due and defendants' motion should

be granted on this ground.

### ii. Opportunity to Present Defense

LeBron claims that he was denied (1) adequate inmate assistance because he was not provided with papers which he requested from Mehrmann, (2) the ability to question witnesses adequately, and (3) the time to place objections and questions on the record.

"[P]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir. 1988). Such an assistant is designed to help disabled inmates "gather[] evidence, obtain[] documents and relevant tapes, and interview[] witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." Id. at 898. The Second Circuit has also held "that for inmates disabled by confinement in SHU . . . the right to substantive assistance is an obligation . . . [to] be provided in good faith and the best interests of the inmate." Id. Any violations of this right to assistance are reviewed to assess "whether the error was harmless or prejudicial." Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991).

In this case, it is undisputed that LeBron was provided with multiple documents including redacted log sheets from the date in question and memoranda from the defendants. Despite these documents, LeBron claimed that he had received inadequate assistance because he was denied other requested log sheets for dates other than January 10 and from areas other than the cellblock in which his cell was located. Hearing at 2-7. As

stated by Faulkner, these items were most likely unavailable to the inmate assistant because they were irrelevant to the pending charges.  Id. at 10.  Mehrmann also failed to provide inventory sheets for razors and white-out, but LeBron was again told that such information was not available as those documents were neither created nor kept in the ordinary course of business.  Id.  The inmate assistant also spoke with inmate Washington and recorded his desire to abstain from testifying.  Id. at 13.  Therefore, it does not appear that the inmate assistant was remiss in any material respect.

Even if the inmate assistant was deficient, such errors were harmless as LeBron had sufficient access to the witnesses and documentary evidence.  Faulkner agreed to substitute one of LeBron's misidentified witnesses.  Hearing at 12, 22-23.  Faulkner also interviewed Washington after he declined to testify[19] to determine if he possessed any pertinent information for the disciplinary hearing.  Id. at 27; Docket Nos. 179-5 at 17, 179-6 at 12.  He did not.  Hearing at 27; Docket Nos. 179-5 at 17, 179-6 at 12.  Faulkner also allowed LeBron to question witnesses at the hearing, including McLaughlin.  Moreover, when LeBron expressed surprise at McLaughlin's testimony, Faulkner granted LeBron's written requests to question McLaughlin, solicited the answers over the weekend, and read the answers into the record when the hearing resumed.  Hearing at 28-30; Docket No. 179-6 at 22-28.  Furthermore, when LeBron stated that he was not provided with the memorandum from Mehrmann, Faulkner made and provided LeBron with additional copies,

---

[19] In previous litigation LeBron has been apprised of "[a] prison disciplinary hearing officer['s lack of] . . . power to force an inmate to testify, and when an inmate refuses, the hearing officer need not call that witness."  LeBron v. Artus, No. 06-CV-532 (VEB), 2008 WL 111194, at *10 (W.D.N.Y. Jan. 9, 2008) (citing Silva v. Casey, 992 F.2d 20, 21-22 (2d Cir. 1993))

despite LeBron's later admission that he had received the memoranda and reviewed them in preparation for the hearing.  Hearing at 26, 28.

Finally, when LeBron added McFarlin as a witness, Faulkner attempted to locate McFarlin for testimony.  His reasonable attempts were thwarted by the failure of McFarlin to leave a forwarding telephone number when released from DOCS custody.  Hearing at 43. Any additional efforts to locate McFarlin in the general population of Manhattan to which McFarlin relocated would have been extraordinary, burdensome, and beyond the bounds of reasonable efforts.

Therefore, any potential defect in the assistance provided by Mehrmann was remedied by Faulkner.  Powell, 953 F.2d at 750.  Accordingly, defendants' motion should be granted on this ground.


### iii. Right to Call Witnesses

LeBron complains that he was prohibited from asking Smith all of the questions he had planned.  "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials . . . ."  Rivera v. Wohlrab, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002).  Deference to a hearing officer's judgment regarding witnesses that will present irrelevant or unnecessary testimony and the overall goal of institutional safety are important considerations to balance against an inmate's procedural due process rights.  Id.; see also Wolff, 418 U.S. at 566 (holding that the goals of the correctional institution remain a paramount consideration); Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) ("It is well settled that an official may

refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." (internal quotation marks and citations omitted)).

LeBron was given ample opportunity to question Smith.  However, his questions soon became argumentative and ssought to elicit no relevant testimony.  Hearing at 32-42. LeBron was warned twice that such questioning would result in a termination of his questioning of the witness.  Id.  LeBron continued his argumentative questioning and the witness was excused.  Deference to such a judgment by the hearing officer is necessary to maintaining order at the hearing.  Faulkner's actions were appropriate in light of LeBron's failure to abide by Faulkner's warnings.

Accordingly, defendants' motion should be granted on this ground.

### iv. Fair and Impartial Hearing Officer[20]

Prisoners have a constitutional right to a fair and impartial hearing officer.  See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  However, "[t]he degree of impartiality

---

[20] To the extent that LeBron contends that Faulkner tampered with the tape recording of the hearing, such serious allegations raise questions concerning the impartiality of the hearing officer.  Odom v. Kerns, No. 99-CV-10668 (KMK/MHD), 2008 WL 2463890, at *11 (S.D.N.Y. June 18, 2008) (citations omitted).  LeBron indicates that Faulkner's actions were responsible for deleting the testimony of J. LeClaire, whose testimony was allegedly inconsistent with his written reports and was arguably exculpatory. See note 7 supra.  First, these allegations are belied by the hearing transcript, which presents a clear and unabridged narrative of the hearing.  Second, the substance of the hearing transcript and Faulkner's reliance on J. LeClaire's testimony which was bolstered by the memorandum and the misbehavior report contradict LeBron's conclusory allegations that J. LeClaire's testimony contradicted his prior reports.  On this a motion for summary judgment, more than conclusory allegations need be proffered to raise a question of fact.  Accordingly, defendants are entitled to judgment on any such claims.

required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted).   The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . " and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487-88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

As discussed, and as the record reflects, Faulkner provided LeBron with every opportunity to present his defense.  Faulkner allowed witnesses to be substituted, interviewed inmates after they refused to testify, attempted to locate a witness who had been released from DOCS custody, provided LeBron with additional documentation at LeBron's request which LeBron had already received, allowed LeBron to question all witnesses, and even submit additional questions to McLaughlin and elicit responses to read into the record to develop the record further for LeBron's hearing. See e.g., Hearing at 12, 22-23, 26-30, 43.  These actions, and the five days of testimony refute LeBron's conclusory allegations of partiality and bias by Faulkner.  Moreover, the physical evidence presented plus the testimony from multiple sources provided Faulkner with more than some evidence upon which to find LeBron guilty of the charges in the misbehavior report.

Accordingly, defendants' motion should be granted on this ground.

**v. Disposition**

As noted above, the Second Circuit has held that once "the procedural due process requirements have been met, its function is to determine whether there is *some* evidence which supports the [disciplinary] . . . decision." Franco v. Kelly, 854 F.2d 584, 588 (2d Cir. 1988); see also Luna, 356 F.3d at 487-88; Hill, 472 U.S. at 455.  Here, even construing the facts in the light most favorable to LeBron, there is sufficient information to conclude that there was presented at the hearing at least some evidence of his guilt of possessing contraband and a weapon.  The misbehavior report, memoranda, and pictures of the confiscated items all supported Faulkner's determination that LeBron was guilty of two of the charges.

LeBron contends, however, that he was not apprised of the disposition because he did not attend the final day of his hearing.  Dep. at 101-102.  LeBron's conclusory allegations that his constitutional rights were violated by the failure of defendants to provide him with assistance to the hearing and the subsequent disciplinary hearing are belied by the record. Medical records indicate that LeBron had no reported injuries or complaints of pain for months prior and subsequent to the disciplinary hearing.  Docket No. 190-2.  These records are supported by the testimony of non-party Provost that LeBron adamantly refused to attend his hearing and understood the consequences of that refusal.  Hearing at 43.

Accordingly, defendants' motion should be granted on this ground.

34

## 2. False Misbehavior Reports

LeBron alleges that he was issued a false misbehavior report in violation of his constitutional rights on January 10, 2002.  As discussed <u>supra</u>, an inmate has a right not to be deprived of a liberty interest without due process.  However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."  <u>Freeman</u>, 808 F.2d at 951.  "There must be more, such as retaliation against the prisoner for exercising a constitutional right."  <u>Boddie</u>, 105 F.3d at 862.  As discussed <u>supra</u>, construing the record in the light most favorable to LeBron, material questions of fact exist whether the evidence underlying the charges was fabricated or possessed by LeBron as charged.  <u>See</u> subsection II(D) <u>supra</u>.  Accordingly, defendants' motion on this claim should be denied.

## 3. Qualified Immunity

Defendants claim that even if plaintiff's constitutional claims are substantiated, they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u>, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights."  <u>Smith v. City of Albany</u>, No. 03-CV-1157, 2006 WL

35

839525, at *16 (N.D.N.Y. Mar. 27, 2006) (quoting <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922, 925 (2d Cir. 1991); <u>Magnotti v. Kuntz</u>, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. <u>Aiken</u>, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached concerning any of LeBron's claims with regard to the due process he was provided at his disciplinary hearing or the mail tampering because, as discussed <u>supra</u>, accepting all of his allegations as true, LeBron has not shown that any of defendants violated his constitutional rights.  However, with respect to LeBron's claims surrounding the retaliation and false misbehavior report, questions of fact have been raised. As to those claims, it is undisputed that an inmate had a well-established right to be free from retaliation from corrections officers and administrators before the alleged violations occurred.  <u>See generally</u> <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996) (discussing an inmate's right to be free from retaliatory acts for constitutionally protected activities).

Accordingly, it is recommended that defendants' motion on this ground be granted in the alternative as to all claims and defendants except for LeBron's First Amendment retaliation and Fourteenth Amendment false misbehavior report causes of action.

### III. Defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders

Summonses for service of process upon defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders were issued on May 18, 2005.  See Docket Entry dated 5/18/05. LeBron was granted in forma pauperis status, Docket No. 4, and the United States Marshals Service attempted service, in August 2005 but the summonses for these five defendants were returned unexecuted.  Docket Nos. 55 (Pasquil), 56 (Leferve), 91 (McLaughlin, Sanders, and Mehrmann).  A summons was reissued for McLaughlin on December 8, 2005.  See Docket Entry 12/8/05.  The Marshals Service attempted service again on February 24, 2006 but was unsuccessful.  Docket No. 123.  LeBron has never provided the Marshals Service with any other address for any of these defendants and they have not otherwise appeared in this action.

On November 21, 2007, over two years after summonses were first issued, LeBron moved for an order for defendants' counsel to accept service on behalf of the aforementioned defendants.  Docket No. 136.  On March 19, 2008, that motion was denied. Docket No. 144.  However, DOCS counsel was requested to advice the Clerk of the current employment status of the defendants for reissuance of the summonses.  Id.  DOCS counsel responded on July 25, 2008 (Docket No. 158), and summonses were reissued for Sanders and Mehrmann.  Docket No. 159.  The summonses were again returned unexecuted as to Sanders and Mehrmann.  Docket No. 164.

Fed. R. Civ. P. 4(m) requires that a complaint be served upon a defendant within 120 days after the complaint is filed or the complaint may be dismissed as to any unserved defendant without prejudice.  See also N.D.N.Y.L.R. 4.1(b). The original complaint naming

37

defendants here was filed on February 9, 2005.  Docket No. 1.  More than 120 days have passed since either the complaint was filed or any of the summonses, for any of these five defendants, were issued.  Accordingly, it is recommended that the action be dismissed as to these defendants without prejudice pursuant to Rule 4(m) and Local Rule 4.1(b).

## IV. Motion to Supplement

LeBron seeks to supplement his amended complaint by adding a new defendant in place of a previously dismissed "John Doe" defendant and changing the name of a previously named defendant, from Pasquil to Perham.  Docket No. 186.

Fed. R. Civ. P. 15(d) allows a party to supplement a pleading with matters that occurred after the filing of the original complaint but which pertain to the original pleading.[21] Albrecht v. Long Island R.R., 134 F.R.D. 40, 41 (E.D.N.Y. 1991). A party may supplement to include subsequent occurrences "absent prejudice to the nonmoving party."  Id.  "It is also proper to permit the filing of a supplemental pleading to add additional parties."  Tobin v. Rell, No. 05-CV-1079, 2007 WL 1520111, at *2 (D. Conn. May 18, 2007) (citing Griffin v. County Sch. Bd. of Prince Edward County, 377 U.S. 218, 227 (1964)(other citation omitted)).

The standard for a motion to supplement is the same as for a motion to amend the pleadings under Fed. R. Civ. P. 15(a).  Klos v. Haskell, 835 F. Supp. 710, 715 (W.D.N.Y.

---

[21]Fed. R. Civ. P. 15(d) states: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time."

1993)(Fisher, M.J.), adopted by 835 F. Supp. 710 (W.D.N.Y. 1993)(Telesca, J.).  Rule 15(a)

provides that a court should grant leave to amend "freely ... when justice so requires."

When exercising its discretion, a court must examine whether there has been undue delay,

bad faith, or dilatory motive on the part of the moving party.  Evans v. Syracuse City School

District, 704 F.2d 44, 46 (2d Cir. 1983) (citing Foman, 371 U.S. at 182).  The court must

also examine whether there will be prejudice to the opposing party.  See, e.g., Ansam

Associates Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985) (permitting

proposed amendment would be especially prejudicial once discovery has been completed

and a summary judgment motion filed).  Finally, where it appears that granting leave to

amend is unlikely to be productive or the amendment is futile, it is not an abuse of

discretion to deny leave to amend.  Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d

Cir. 1993)(citations omitted).

Moreover, in the case of proposed amendments where new defendants are to be

added, the Court must also look to Fed. R. Civ. P. 21.  Rule 21 states that a party may be

added to an action "at any stage of the action and on such terms as are just."  Rule 21 is

"intended to permit the bringing in of a person, who through inadvertence, mistake or for

some other reason, had not been made a party and whose presence as a party is later

found necessary or desirable."  United States v. Commercial Bank of N.A., 31 F.R.D. 133,

135 (S.D.N.Y. 1962) (internal quotations omitted).  Addition of parties under Rule 21 is also

guided by the same liberal standard as a motion to amend under Rule 15.  Fair Housing

Dev. Fund Corp. v. Burke, 55 F.R.D. 414, 419 (E.D.N.Y. 1972).

In the four and one-half years since LeBron filed his original complaint, defendants

have filed a motion to dismiss, completed discovery, and filed a motion for summary

judgment.  If LeBron is permitted to supplement his amended complaint to add new

defendants at this late juncture, defendants would be put to the burden of waiting for the

new defendants to be served, answering the supplemental complaint, and potentially

engaging in additional discovery long after the time for discovery has closed in a case they

have defended for over four and one-half years.  See Besicorp Group, Inc. v. Thermo

Electron Corp., No. 90-CV-434, 1993 WL 105163, at *3 (N.D.N.Y. Apr. 6, 1993) (Munson,

J.) (allowing plaintiff to file a supplemental complaint after discovery has closed would result

in undue delay and prejudice to the opposing party); see also Richardson Greenshields

Sec. Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir.1987) (undue prejudice warranted denial of

leave to amend where proposed claim would have significantly increased scope of

discovery when case was ready for trial).

Therefore, because undue prejudice would occur to defendants at this late date and

would significantly delay the resolution of this already long-pending action, LeBron's motion

to supplement his amended complaint is denied.


## V. Motion to Strike

LeBron filed a motion pursuant to Fed. R. Civ. P. 12(f) seeking to strike (1) papers

attached to defendants' motion for summary judgment, and (2) Silverman's affidavit for

insufficient personal knowledge.  Docket No. 187.  Under Fed.R.Civ.P. 12(f), a court may

strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent,

or scandalous matter."  However, motions to strike portions of affidavits or evidence of

support thereof are not consistent with the purpose of Rule 12(f).  See Dragon v. I.C. Sys.,

Inc., 241 F.R.D. 424, 425-26 (D. Conn. 2007).  Such materials are not technically pleadings,

but given the lack of other options to challenge affidavits, "courts have been willing to view

motions to strike as calling the propriety of affidavits into question."  Id. (citations omitted).

In this case, the affidavit of defendants' counsel, Adam Silverman, addresses the

remaining causes of action after the motion to dismiss was decided, the remaining

defendants, the veracity of the documents submitted in support of the remaining

defendants' arguments, and LeBron's pertinent administrative record.  Silverman Aff.

(Docket No. 179-2).  Any discussion in the affidavit about the course of the litigation

stemmed from personal knowledge as Silverman was directly involved in all stages.

Additionally, all attached documents were relevant to the remaining causes of action,

certified, and kept in DOCS' regular course of business.  Thus, records which were utilized

during the course of the disciplinary hearing are admissible and available for consideration.

Accordingly, LeBron's motion to strike is denied.


## VI.  Conclusion

For the reasons stated above, it is hereby

1. **RECOMMENDED** that:

A. Defendants' motion for summary judgment (Docket No. 179) be

i. **DENIED** as to LeBron's First and Fourteenth Amendment claims for

retaliation and filing a false misbehaviour report as to defendants Sorenzon, Walcott, J.

LeClaire, Smith, Boyton, Roque, Colby, Burke, Murphy, Selsky, and L. LeClaire; and

ii. **GRANTED** as to all other claims and all other defendants except defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders;

B. The amended complaint be **DISMISSED** without prejudice as to defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders; and

2. **ORDERED** that

A. LeBron's motion to supplement (Docket No. 186) is **DENIED**; and

B. LeBron's motion to strike (Docket No. 187) is **DENIED**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED: September 11, 2009
        Albany, New York

United States Magistrate Judge

42